**TURBOCARE DIVISION OF DEMAG DELAVAL TURBOMACHINERY CORPORATION, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**No. Civ.A. 95–30069–MAP.**

United States District Court, D. Massachusetts.

March 31, 1999.

Catriona Collins, Francis J. Murphy, Alan H. Pollack, Kimberly S. Chotkowski,

Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, Michael J. Coyne, Bacon & Wilson, P.C., Springfield, MA, for Turbocare Division of Demag Delaval Turbomachinery Corporation, plaintiff.

Mark T. Banner, Christopher J. Renk, Allegretti & Witcoff, Chicago, IL, John P. Iwanicki, Sanjay Prasad, Banner & Allegretti, Ltd., Boston, MA, Thomas K. Pratt, Banner & Allegretti, Ltd., Chicago, IL, for General Electric Company, defendant.

C. Brian McDonald, Bulkley, Richardson & Gelinas, Springfield, MA, for Clifford G. Brock, movant.

## ORDER

PONSOR, District Judge.

For the reasons stated in the accompanying Memorandum, the Report and Recommendation of Magistrate Judge Neiman is hereby adopted *in toto*. Defendant's motion for summary judgment for unenforceability is hereby DENIED, and defendant's motion for partial summary judgment for invalidity is ALLOWED. The clerk will set a date for a status conference to set a schedule for future proceedings.

## MEMORANDUM REGARDING REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY AND FOR SUMMARY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. 5,037,115

### I. INTRODUCTION

This is an action seeking damages for infringement of two United States patents: Patent No. 4,436,311, entitled "Segmented Labyrinth–Type Shaft Sealing System for Fluid Turbines" (the "'311 patent") and Patent No. 5,037,115, entitled "Piston Ring Assemblies for High Temperature Seals"

(the "'115 patent"). Some of the background facts are set forth in a previous opinion of this court on an earlier motion regarding plaintiff's first cause of action, raising the '311 patent.[1] *See TurboCare Div. of Demag Delaval Turbomachinery Corp. v. General Elec. Co.*, 938 F.Supp. 83 (D.Mass.1996).

In this memorandum the court will address GE's motion directed at plaintiff's second cause of action. The motion seeks partial summary judgment regarding two of three claims in the '115 patent, on the ground of invalidity, and summary judgment on the entirety of the second cause of action because the incorrect patent fee was paid at the time of the patent's issuance in 1991.

GE's motion was referred to Magistrate Judge Kenneth P. Neiman, who has issued a Report and Recommendation to the effect that the motion asserting invalidity be allowed and the motion raising the failure to pay the proper fee be denied. Both parties have filed objections to the Report and Recommendation. Since this court's *de novo* review reveals that Magistrate Judge Neiman's analysis was entirely correct, the court will adopt his recommendation and rule in accordance with it. The detail and care exhibited by the Report and Recommendation, attached to this memorandum at Exhibit A, make lengthy discussion here unnecessary.

### II. FACTUAL BACKGROUND

The pertinent facts of record are set forth in the Report and Recommendation at pages 3–10. They are essentially undisputed and need not be repeated here.

### III. DISCUSSION

Disposition of the defendant's motion requires this court to address only two relatively straightforward questions. First, does the fact that the inventor of the '115

---

1. The court has also issued a memorandum today adopting the Report and Recommendation of Magistrate Judge Kenneth P. Neiman, and denying defendant's motion for summary judgment regarding the '311 claim on the grounds of equitable estoppel or laches.

patent, Ronald E. Brandon, paid the "small entity" patent issuance fee of $525.00 when the patent issued in 1991, instead of the "large entity" fee of twice that amount, render the '115 patent unenforceable? Second, were the first two claims of the '115 patent "anticipated" by a patent application for an essentially identical apparatus, the so-called "Hitachi reference," made to the Japanese Patent Office in the late 1970s and disclosed to the public on November 29, 1977?

█ The answer to the first question is not difficult. As a preliminary matter, the law is far from settled that a simple error in payment of a fee amount will irretrievably extinguish an inventor's patent rights. The one opinion cited by the defendant in support of this rather draconian proposition, *DH Technology, Inc. v. Synergystex International, Inc.,* 937 F.Supp. 902 (N.D.Cal.1996), even though it involved facts far more egregious than those presented here, has been reversed on appeal. *See* 154 F.3d 1333, 1342 (Fed.Cir.1998). More importantly, the record is undisputed that in 1991 Brandon, not the large corporate entity Imo, owned the patent. As it happens, Brandon owns the patent to this day. In fact, Imo did not even possess a formal license agreement permitting exploitation of the patent until 1994. The plain truth is that an informed applicant in Brandon's shoes, operating in good faith, would have paid the $525.00 fee in 1991. The most that could even be colorably (though unpersuasively) argued is that Brandon made a minor, good faith error, because Imo's possession of some sort of implied license made the higher fee more appropriate. The demand for such dire consequences for this mistake, if mistake there was, has no foundation.

The answer to the second question requires a slightly more complex analysis but in the end is equally manifest.

The court's inquiry will begin will the patented device itself, a solid ring assembly used to seal the steam input areas of steam turbines. The basic underlying engineering problem arises from the fact that where the pipe carrying steam passes through and into the turbine casing, some sort of seal must be provided to prevent steam leakage and resulting loss of turbine efficiency. The challenge to a designer of such a seal is prodigious, because the extremely hot steam coming in through the pipe, called the "snout" pipe, will cause both the pipe and the turbine casing to expand and move relative to each other. The seal has to allow for such movement while maintaining a tight fit.

Prior art assemblies employed to attack this problem used an array of alternating small and large piston rings. The small rings had an inner circumference nearly identical to the outer circumference of the snout pipe, and the larger rings had an outer circumference nearly identical to the inner circumference of the turbine casing. The small and large rings could slide in relation to each other, permitting some motion while providing a tight seal.

This solution had a serious drawback, which the Brandon patent attempted to address. The fit between the outer, larger rings and the turbine casing, and between the inner, smaller rings and the snout pipe was so snug that assembly of the seal was often difficult. Moreover, after years of exposure to high temperature steam, oxide coatings would develop on both sets of rings, tending to lock them into position and undermine their essential mission, which was to move and expand while maintaining the seal. In addition, the oxide layers made it difficult to disassemble the seal for normal maintenance without damaging the turbine casing, snout pipe or the rings themselves.

Claim 1 of the patent describes an assembly in which the large rings expand *more* than the surrounding casing when exposed to extreme heat (meaning, in technical terms, that they possess a greater "coefficient of thermal expansion") and the small rings expand less than the snout pipe. As a result, when the turbine is shut

down, and therefore cool, the larger rings will fit more easily into position within the casing, and the smaller rings will slide more easily over the snout pipe. When the turbine resumes operation, and heats up, the larger rings will expand more than the surrounding casing, making a tight fit, and the smaller rings will expand *less than* the snout pipe, with the same result. Significantly, Claim 1 makes no mention of the actual material that might be used to manufacture the rings in order to insure the different rates of expansion. It only describes the basic mechanism.

Claim 2 is dependent on Claim 1 and includes all its limitations, but with one addition: that the *small* piston rings "are fabricated from materials selected from any of the martensitic stainless steels for use at elevated temperature." (Defendant's Exhibit. B, '115 Patent, Col. 6, Ins. 26–29)

The record is undisputed, and plaintiff does not appear to contest, that the Hitachi reference is virtually identical to Claims 1 and 2. As with the '115 patent, its operation depends on the differential expansion of the rings when exposed to heat. The only slight difference, which plaintiff concedes does not distinguish it from the '115 patent, is that the Hitachi reference specifies the material to be used for the small rings: 12 chrome steel, which is one form of martensitic stainless steel.

Like Claims 1 and 2 of the '115 patent, the Hitachi reference does not specify any material to be used in manufacturing the *outer* rings. It simply states that they should be of a material having a greater coefficient of thermal expansion than the casing. This deficiency, plaintiff claims, is crucial to the "anticipation" analysis.

Unlike the Hitachi reference, Claim 3 of the '115 patent adds a further limitation: that "... the [large] piston rings are fabricated from materials selected from any of the austenitic stainless steels and precipitation hardening alloys intended for high temperature applications...." (Defendant's Exhibit B, '115 Patent, Col. 6, Ins. 30–34) TurboCare does not contend that the materials specified in Claim 3 are the only materials usable for the large ring, or that the subject matter of Claim 3 is necessary in order to make Claim 1 work. Further, it is important to remember that Claim 3 is not the subject of this motion for summary judgment. In other words, GE does not contend that Claim 3 was anticipated by the Hitachi reference.

Having examined the patent, the court will now turn to the law.

■ 35 U.S.C. § 102 prohibits entitlement to a patent where the invention was patented or described in a printed publication, in this country or abroad, more than one year prior to the date of application in the United States. A patent claim is anticipated, and therefore invalid, "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." Where a defendant can make such a showing by pointing to undisputed facts of record, summary judgment is appropriate. *See Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed. Cir.1991).

■ Even if a claimed invention is disclosed in a printed publication, that disclosure will not justify summary judgment as prior art, if it is not "enabling." *Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.,* 804 F.2d 659, 665 (Fed.Cir.1986) (citations omitted). To be enabling, the prior disclosure, here the Hitachi reference, "must be such as will give possession of the invention to a person of ordinary skill." *Id.* (quoting *In re Borst,* 52 C.C.P.A. 1398, 345 F.2d 851, 855 (Cust. & Pat.App.1965)).

■ TurboCare argues that the Hitachi reference would not give such a person "possession of the invention" because (like Claims 1 and 2) the Hitachi reference does not specify the *material* to be used in making the large rings. Plaintiff points to the rather ambiguous affidavit of its expert

Richard Shiffler for the proposition that discovering the material for the large rings would require additional work and perhaps some testing.

At another point in his deposition, however, Shiffler concedes that no "undue experimentation" would be needed to discover the appropriate material. (Defendant's Exhibit Q, Shiffler Dep. at 558)

TurboCare's argument that the Hitachi reference is not "enabling" fails for two reasons. First, the prior reference is, for all practical purposes, identical to Claims 1 and 2. Plaintiff appears to concede in its memorandum that the focus in evaluating prior art is on the *claims*, but then tries by a rather contorted argument to bring Claim 3, which is not the target of defendant's motion, into the analysis. Counsel concedes that Claim 3 cannot be "read into" Claims 1 and 2 in evaluating the prior art, but nevertheless argues that the *"disclosure* of the '115 patent" as a whole is necessary to teach one skilled in the art how to make the inventions of Claims 1 and 2. (Docket No. 142 at 14 (emphasis in original))

This argument will not wash. The Hitachi reference is identical in every pertinent respect to Claims 1 and 2 of the '115 patent. Claim 3 cannot be dragged in through the back door to avoid summary judgment.

Second, and equally importantly, the Hitachi reference is "enabling" as a matter of law. The mere fact that some experimentation and possible testing might be needed to select the appropriate material for one part of the invention does not justify the conclusion that the prior art does not disclose the invention to a person with pertinent experience. A patent is not required to be a production specification; it will suffice if a skilled person "using the knowledge available to such a person and the disclosure in the patent document, could make and use the invention without undue experimentation." *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 941 (Fed.Cir.1990). Here, the court finds on the undisputed record that, as a matter of law, the amount of effort needed to select the material for the large rings—an effort that would in any case be needed exploit the invention asserted in Claims 1 and 2—was *not* undue.

### IV. *CONCLUSION*

For the foregoing reasons, the Report and Recommendation of Magistrate Judge Neiman is hereby adopted *in toto*. Defendant's motion for summary judgment for unenforceability is hereby DENIED, and defendant's motion for partial summary judgment for invalidity is ALLOWED. The clerk will set a date for a status conference to set a schedule for future proceedings.

A separate order will be issue.

### EXHIBIT A

### UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

TURBOCARE DIVISION OF DEMAG DELAVAL TURBOMACHINERY CORPORATION, Plaintiff

v.

GENERAL ELECTRIC COMPANY, Defendant

Civil Action No. 95–30069–MAP

*REPORT AND RECOMMENDATION WITH REGARD TO GENERAL ELECTRIC COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY AND A SUMMARY JUDGMENT OF UNENFORCEABILITY OF U.S.PATENT NO. 5,037,115 (Docket No. 106)*

NEIMAN, United States Magistrate Judge.

### I. *INTRODUCTION*

In this action, TurboCare Division of the Demag Delaval Turbomachinery Corpora-

tion ("Plaintiff"), proceeding pursuant to 35 U.S.C. § 271, charges in its second cause of action that the General Electric Company ("Defendant") infringed Plaintiff's United States Patent No. 5,037,115 ("the '115 patent"). Defendant's motion for summary judgment, which has been referred to this Court for a report and recommendation, *see* 28 U.S.C. § 636(b)(1)(B), has two parts. First, Defendant has moved for partial summary judgment, asserting that two of the three claims in Plaintiff's '115 patent are invalid because they were not novel at the time of their alleged invention. Alternatively, Defendant seeks summary judgment on the entirety of Plaintiff's second cause of action, asserting that the '115 patent lapsed and is unenforceable due to Plaintiff's failure to pay the appropriate patent fee. For the following reasons, the Court recommends that Defendant's motion be allowed in part and denied in part.[1]

## II. *STANDARD OF REVIEW*

In accordance with Fed.R.Civ.P. 56(c), summary judgment may be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *See National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). Once the moving party has established that no genuine issue of material fact exists, the burden shifts to the opposing party to contradict the showing "by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." *National Amusements,* 43 F.3d at 735.

A "genuine" issue is one that a factfinder could reasonably resolve in favor of the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995); *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992). Not every genuine factual conflict, however, necessitates a trial. " 'It is

only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon,* 54 F.3d 980, 983–84 (1st Cir.1995)). It is likewise well settled that "[s]ummary judgment is as appropriate in a patent case as in any other where no genuine issue of material fact is present and the movant is entitled to judgment as a matter of law." *Townsend Eng. Co. v. Hitec Co., Ltd.,* 829 F.2d 1086, 1089 (Fed.Cir.1987). *See also Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1265 (Fed.Cir.1991).

## III. *BACKGROUND*

Ronald E. Brandon ("Brandon"), an individual inventor named in over twenty United States patents, made the alleged invention covered by the '115 patent in the late 1980's. (*See* Def. Exhibit A at 526–27.) The patent which issued is entitled "Piston Ring Assemblies for High Temperature Seals." The '115 patent contains multiple claims and relates to sealed passages for steam between two separate casings used to power a steam turbine. The patent relates more particularly to the materials used in piston ring assemblies for such sealed passages and the overall increased efficiency of the steam turbine based on improvements to those seals. (*See* Def. Exhibit B; Pl. Exhibit 6).

### A. *The technology of the '115 Patent*

An overview of the mechanics of steam turbines and previously existing ("prior art") piston ring assemblies is essential to an understanding of the '115 patent technology. Generally, steam turbines consist of a steam inlet pipe which must pass through the inner and outer casings of the turbine. At each point where the pipe passes through a casing, a seal must form

---

1. Defendant also filed a summary judgment motion regarding a second allegedly infringed patent, United States Patent No. 4,436,31. A

report and recommendation concerning that motion issued on June 25, 1997. (*See* Docket No. 135.)

to prevent the leakage of high pressure steam, thereby maximizing the efficiency of the turbine.

The typical prior art piston ring assembly utilized alternating small and large piston rings to provide the seal. The small piston rings had an inner circumference, which closely matched the outer circumference of the steam entry pipe, and fit tightly around the outer periphery of the inner steam pipe, preventing steam leakage at that interface. Similarly, the large piston rings had an outer circumference that closely matched the inner circumference of the surrounding casing and fit tightly against the wall of the casing, eliminating steam leakage at that interface. To further minimize steam leakage, the small and large piston rings were stacked alternatively, with common contact surfaces on their upper and lower faces, to prevent leakage between the adjacent piston rings. Finally, other rings, called either locking or retaining rings, were used to hold the small and large ring assembly in place.

Because the outer rings fit tightly in the casing to provide the seal, the rings necessary to form the seal were cooled and thus shrunk prior to installation so that they would fit more easily within the casing. However, the tight fit of the inner rings made assembly of the pipe through the rings more difficult. Because the steam pipe and the casings moved independently, albeit relative to each other, the seal formed had to allow for such movement. As noted in the '115 patent, after years of exposure to high temperature steam this assembly was vulnerable to the formation of oxide coatings, causing the rings to lock in position rather than move freely. Further, disassembly for maintenance could damage various parts of the seal.

It is undisputed that all of the above concepts were prior art and not part of the teachings of the '115 patent. (*See* Def. Exhibit A at 555.) What the '115 patent addresses is an improvement in the seal assembly through the selection of materials. Accordingly, claim 1 of the '115 patent describes a piston ring seal assembly containing both small piston rings (that rest adjacent to the interior pipe) and large piston rings (that rest adjacent to the outer casing). Claim 1 teaches that the material used for each of the large rings expands more under high operating temperatures than the surrounding casing or, in scientific parlance, has a coefficient of thermal expansion greater than that of the turbine casing. The term "coefficient of thermal expansion" describes the rate of expansion of a material as heat is applied. Claim 1 also teaches that each of the small rings is fabricated from a material having a coefficient of thermal expansion less than that of the steam inlet pipe, expanding less then the inlet pipe under operating conditions. Claim 1 further describes a system whereby the coefficient of thermal expansion of the material contained in the seal and the material against which it is sealing close tighter under increasing temperatures increasing the overall efficiency of the steam turbine.[2]

2. Claim I reads as follows:

In a turbine inclusive of:
a turbine shaft having a longitudinal axis,
a steam pipe,
a shell circumadjacent the pipe,
the pipe and shell being shiftable in vertical and transverse and axial directions relative to the longitudinal axis of the shaft, and a seal assembly disposed between the pipe and shell and comprising a stack of interdigitated relatively large and small piston rings,
*the improvement comprising:*
*each large ring*

(a) loosely fitting inside the shell during nonoperative conditions and firmly and sealingly engaging the shell during operative conditions; and

(b) *having a coefficient of thermal expansion greater than that of the shell* for expanding at a rate faster than the expansion rate of the shell under a condition of increased temperature,
*each small ring*

(a) loosely fitting around the pipe during nonoperative conditions and firmly and sealingly engaging the pipe during operative conditions; and

Claim 2 of the '115 patent, which is dependent on claim 1, specifies that "the small piston rings are fabricated from materials selected from any of the martensitic stainless steels for use at elevated temperatures." (Def. Exhibit B, Pl. Exhibit 6 at 28629). In a third claim (claim 3), not challenged as invalid by Defendant's motion, Brandon proposed that the large rings be fabricated from "materials selected from any of the austenitic stainless steels and precipitation hardening alloys intended for high temperature application." *Id.* In sum, the inventions in the '115 patent are intended to increase the overall efficiency of the turbine, reduce the tendency of the rings to lock in position and to facilitate the removal of the piston rings for easy maintenance. (*See* Def. Exhibit B.)

### B. The Hitachi reference

In the late 1970's, a patent application, Kokai No. 52–143312 assigned to Hitachi K.K. ("the Hitachi reference"), was filed in the Japanese Patent Office.[3] The Hitachi reference was laid open to the public on November 29, 1977. As with the later '115 patent, the Hitachi reference describes a piston ring seal assembly with large rings made from a material having a coefficient of thermal expansion greater than that of the casing surrounding them, and small rings made from a material having a coefficient of thermal expansion less than that of the steam inlet pipe that is surrounded by the small ring.[4] The large and small rings are arranged alternatingly along the casing surrounding the inlet pipe. (*See* Def. Exhibit C at 4, Fig. 3; Def. Exhibit D; Def. Exhibit E).[5] The Hitachi reference teaches, as an example, that the steam pipe may be formed of molybdenum vanadium steel and that the small rings can be fabricated from 12% chromium stainless steel ("12Cr steel"). While it is not the only martensitic stainless steel, 12Cr steel is *one* martensitic stainless steel. (*See* Def. Exhibit F at 23–15.)

### C. Ownership of the '115 Patent License

Brandon, with the assistance of Quabbin Industries ("Quabbin"), a company of 118 employees with which Brandon had a business relationship, filed for small entity status with the Patent and Trademark Office ("PTO") in September of 1989, (Def. Exhibit G), a filing status applicable to small

---

(b) *having a coefficient of thermal expansion less than that of the pipe* for expanding at a rate slower than the expansion rate of the pipe under a condition of increased pressure,
*with the large and small rings tightening upon the respective shell and pipe respectively under an increasing temperature condition and shrinking from the respective shell and pipe respectively under a decreasing temperature condition due to the relative coefficients of thermal expansion between the large and small rings and the respective shell and pipe.*
(Defendant's Exhibit B (Docket No. 112)) (emphasis added).

3. A translation of the Hitachi reference can be found as Exhibit C to Defendant's brief.

4. The terms thermal expansion and linear expansion, translated in the Hitachi reference, are synonymous.

5. The Hitachi reference discloses at page 4 the following pertinent language:

According to the present invention, the seal ring 11 shown in Fig. 3 is formed of a material having a lower coefficient of linear expansion than the material of the pipe 7a so that the pipe 7a can be inserted into the seal ring 11 with the gap G left there between during installation and assembly. They are heated and expanded by the main steam temperature during operation, but the gap g1 is reduced due to the lower coefficient of linear expansion of the seal ring 11.

The same concept may be employed for the outer gap g2 of the outer seal rings 11b. That is, the same advantage is achievable by selecting such that the outer seal rings 11b have a greater coefficient of thermal expansion than the casing 12. It is understood that although the gap is zero during operation, a sufficient gap is available during installation, permitting easy assembly and disassembly without causing damage to the sealing surfaces.

business concerns, independent inventors and nonprofit organizations. At about the same time, on September 11, 1989, Brandon filed his '115 patent application with the PTO which subsequently issued a notice of allowance of the patent on March 20, 1991. (Def. Exhibit B.) Brandon paid the small entity patent issuance fee of $525 on May 3, 1991. (*See* Def. Exhibit L.) The patent issued on August 6, 1991.

Prior to the patent's issuance, Quabbin agreed to pay Brandon an 8% commission on their 'snout ring sales' pursuant to a written agreement with Brandon. It is undisputed that these were sales related to Brandon's claimed inventions in the '115 patent.

On July 2, 1990, Quabbin was purchased by Imo Industries, Inc. ("Imo"), (*see* Def. Exhibit H), which continued to pay Brandon commissions of 8% on all sales of technology claimed in the '115 patent. (*See* Def. Exhibits I; Def. Exhibit J). According to its 1990 annual report, Imo had over 6,000 employees in the United States. (*See* Def. Exhibit O.)

In March of 1992, an exclusive licensing agreement between Imo and Brandon was negotiated regarding the '115 patent, but after negotiations fell apart, the agreement was not executed. (Pl. Exhibit 5.) On September 3, 1993, Brandon wrote to Imo and demanded that it refrain from selling products based on the '115 patent, among other "unassigned patents." (Pl. Exhibit 3.) In response, Imo asserted that it believed it had a right to sell products based on the '115 patent. (Pl. Exhibit 4.) Later, after January of 1994, Brandon licensed the '115 patent to Imo, (Pl. Exhibit 2A at 617–18), and received at least $52,000 in related royalties that year. (*See* Def. Exhibit M.) Mannesmann Capital Corporation ("Mannesmann") purchased Imo's Turbo-Care Division on January 17, 1995, (see Exhibit N), and together with its wholly-owned subsidiary, Plaintiff Demag Delaval Turbomachinery Corporation, became the licensee of the '115 patent that same day.

## IV. *DISCUSSION*

Defendant makes two distinct arguments. First, pursuing partial summary judgment with respect to two of the three claims in the '115 patent, Defendant avers that both claims 1 and 2 are invalid because they are not novel, i.e., they were 'anticipated' by the Hitachi reference. Invalidity for anticipation precludes a cause of action for patent infringement as a matter of law. Second, Defendant asserts that the '115 patent is unenforceable in its entirety because, when the patent issued, Brandon failed to pay the appropriate patent issuance fee, thus causing the patent to lapse. Because Defendant's second argument, if adopted, would completely dispose of Plaintiff's cause of action with respect to the '115 patent, it is addressed first.

### A. *Unenforceability*

A fee consistent with a sum specified by the PTO is due within three months of the allowance of a patent application. 35 U.S.C. § 151. If the payment is not timely made, the application shall be regarded as either abandoned or lapsed. *Id.* In either event, a failure to pay the appropriate fee commensurate with one's patent will render the patent application a nullity. *See Id.* The essence of Defendant's unenforceability argument is that Brandon failed to pay the correct statutory fee.

There is apparently no dispute that Brandon paid a small entity fee for the patent. The statutory small entity fee is half that required of a large entity. 35 U.S.C. § 41(h)(1). As indicated, the lesser fee is made available to small business concerns, independent inventors and nonprofit organizations, as defined by regulations promulgated pursuant to the statute. *Id.*[6] "[O]nce status as a small entity has been established in an application or pat-

---

**6.** The applicable federal regulation specifically defines a small business concern as a business, together with its affiliates, whose

number of employees does not exceed five hundred persons and

ent, fees as a small entity may thereafter be paid in that application or patent without regard to a change in status until the issue fee is due or any maintenance fee is due." 37 C.F.R. § 1.28(b).

Defendant avers that Brandon was not entitled to pay the small entity fee when the patent issued in 1991. Rather, Defendant argues, it was Imo, concededly a large entity, which either owned or was licensed the '115 patent at the time. Accordingly, Defendant argues, a large entity fee was due and, since no such payment was made, the patent is unenforceable. Relying predominantly on one case, *DH Technology, Inc. v. Synergystex Intl., Inc.,* 937 F.Supp. 902, 905–07 (N.D.Cal.1996), Defendant asserts that Brandon, as the inventor, not only had to verify his small entity status at the time of the patent application, but had a continuing duty to inform the PTO he was no longer entitled to "small entity status."

In *DH Technology,* however, unlike the case at bar, it was undisputed that the plaintiff was ineligible for small entity status. Accordingly, the court's inquiry focused on whether the plaintiff's failure to claim a lack of small entity status, while knowing that it was ineligible, was so egregious as to breach a duty of good faith regarding self-verification and to commit fraud upon the PTO. *Id.* at 906–07. That is simply not true with respect to the present matter. In fact, the very reason why Plaintiff should survive Defendant's motion for summary judgment centers on a genuine dispute regarding the ownership, if not licensure, of the '115 patent in August of 1991, when the patent issued.

In contrast to the plaintiff in *DH Technology,* Plaintiff presents sufficient factual evidence to argue that, despite Imo's purchase of Quabbin, Imo did not purchase or license the '115 patent between Brandon's filing and receipt of his patent. Brandon himself disputes that a license issued to Imo in this time period. (Pl. Exhibit 2A; *see also* Pl. Exhibit 2B (Ciara Dep. at 298–299)). As Plaintiff argues, if Imo had a license under the '115 patent in August of 1991, it would not have spent the next two and one-half years attempting to obtain the very same license from Brandon. Nor would Brandon have been in a position, as late as September of 1993, to threaten to exclude Imo from the manufacture or sale of products covered by the "unassigned" '115 patent.

The only writing which Defendant alleges to be a license agreement is a letter of April 12, 1990, from Quabbin to Brandon. (*See* Def. Exhibit I.) The letter, however, makes no reference to the '115 patent or its application. The letter merely provides for payment of "commissions" to Brandon on the sale of a number of products and services which related to " . . . joint efforts on new applications for efficiency products." Although one of the enumerated products on which commissions were payable, "articulated snout rings," related to the '115 patent application, it is debatable whether the April 12, 1990, letter amounted to a license. This is so even though Brandon, in his declaration claiming small entity status, listed Quabbin as an organization to which he had "assigned, granted, conveyed, or licensed or [was] under an obligation under contract or law to assign, grant or convey, or license any rights in the [patent] invention." (Def. Exhibit G). Such a representation does not a license make.

Given the genuine and material factual disputes, the Court finds that the case is not appropriate for summary judgment based on patent unenforceability.[7]

is under no obligation under contract or law to assign, grant, convey or license, any rights in the invention to any person who could not be classified as an independent inventor if that person had made the invention, or to any concern who would not qualify as a small business concern or a nonprofit organization under this section. 37 C.F.R. § 1.9.

7. Defendant advances another argument, also based on *DH Technologies,* namely, that it is now too late for Plaintiff to correct Brandon's

## B. *Invalidity*

Defendant fares significantly better with respect to its assertion regarding the invalidity of parts of the '115 patent. Defendant maintains that it could not have infringed Plaintiff's patent because claims 1 and 2 were anticipated by the Hitachi reference, thus precluding infringement as a matter of law. Of course, Defendant's argument falls squarely within the statutory framework that "[e]ach claim of a patent (whether in independent, dependent or multiple dependent form) shall be presumed valid independently of the validity of other claims." 35 U.S.C. § 282. Thus, Defendant bears the burden of overcoming that presumption and demonstrating the invalidity of the '115 patent based on anticipation. *Kori Corp. v. Wilco Marsh Buggies and Draglines, Inc.*, 708 F.2d 151, 154 (5th Cir.1983). However, inasmuch as the presumption is based on a deference to the PTO in determining patent validity, its force fades when the prior art was unknown to the PTO at the time of patent prosecution. *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359–60 (Fed.Cir.1984).

### 1. *The anticipation standard*

Defendant's anticipation argument derives from 35 U.S.C. § 102 which provides, in pertinent part, that a person shall be entitled to a patent unless:

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102. Anticipation is a technical defense grounded in this statutory language and requires a showing, by the party claiming anticipation, of actual identity of the later invention in prior art. *Nat'l Bus. Sys., Inc. v. AM Int'l, Inc.*, 743 F.2d 1227, 1235 (7th Cir.1984); *Kori Corp.*, 708 F.2d at 154; *Plastic Container Corp. v. Continental Plastics of Okla., Inc.*, 708 F.2d 1554, 1559 (10th Cir.1983); *American Original Corp. v. Jenkins Food Corp.*, 696 F.2d 1053, 1057 (4th Cir.1982); *Velo-Bind, Inc. v. Minn. Mining & Mfg. Co.*, 647 F.2d 965, 970 (9th Cir.1981).

The standard for measuring claim anticipation is exacting. In order for a claim to be invalid for anticipation, each and every element of the claim must be contained in a single prior art reference. *In re Graves*, 69 F.3d 1147, 1151 (Fed.Cir.1995).[8] All

failure to pay the large entity issuance fee. Defendant avers that that failure, even if it was unintentional or unavoidable and thus open to correction under the statute, *see* 37 C.F.R. § 1.317, cannot be remediated because the time has long since passed for a seasonable correction, *id.; see also DH Technology, Inc.*, 937 F.Supp. at 907. Given the evidence surrounding Brandon's reasonable belief that he was entitled to small entity status, this bootstrap argument is not dispositive.

8. *See also Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed.Cir.1991) ("Anticipation can occur when a claimed limitation is 'inherent' or otherwise implicit in the relevant reference."); *Scripps Clinic & Research Found. v. Genentech Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991) ("[T]he claimed process, including each step thereof, must have been described or embodied, either expressly or inherently, in a single reference."); *Brown–Bridge Mills, Inc. v. Eastern Fine Paper, Inc.*, 700 F.2d 759, 762 (1st Cir. 1983) (for anticipation to occur "elements of the claimed invention or their equivalents [must be] functioning in essentially the same way") (citing *Shanklin Corp. v. Springfield Photo Mount Co.*, 521 F.2d 609, 616 (1st Cir. 1975)); *Cf. Butler v. Helms*, 550 F.2d 954, 956–57 (4th Cir.1977) ("[A] merely extraneous structural feature recited in a claim, which has no function with respect to the invention claimed, should not prevent invalidity for anticipation if all of the requirements of anticipation are otherwise met."); *Procter & Gamble Co. v. Nabisco Brands Inc.*, 711 F.Supp. 759, 762 (D.Del.1989) ("The prior art need not, however, state the elements of the claim in identical language"). *But see Akzo N.V. v. U.S. Intern. Trade Com'n*, 808 F.2d 1471, 1479 (Fed.Cir.1986).

parts of the inquiry must be proven by clear and convincing evidence at trial. *Verdegaal Bros., Inc. v. Union Oil Co. of Calif.,* 814 F.2d 628, 631 (Fed.Cir.1987). A similar quantum of proof is likewise considered at the summary judgment stage. *Scripps,* 927 F.2d at 1576.[9]

Whether the prior art meets the anticipation criteria, rendering a patent invalid, turns initially on the interpretation of each specific claim set forth in the patent. A judge is charged with the ultimate interpretation of the various claims made by an inventor because patent construction is analogous to other issues regarding construction and, thus, is always a question of law. *Markman v. Westview Instruments,* 517 U.S. 370, 116 S.Ct. 1384, 1394, 134 L.Ed.2d 577 (1996). Because patents are legal instruments, a judge ultimately is charged with "giving to the patent its true and final character and force." *Id.* (quoting 2 W. Robinson, Law of Patents § 732 at 481–83 (1980)). A judge is deemed to have the training and practice to make sounder determinations regarding the interpretation of the various claims in a patent because of his or her training in the interpretation of those and other legal instruments. *Id.* As recently as last year, the Supreme Court noted that "[t]he construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis." *Id.*

Plaintiff argues and Defendant concedes that, while claim interpretation is solely for a court, anticipation is a question of fact. *In re Graves,* 69 F.3d at 1151; *In re Lowry,* 32 F.3d 1579, 1582 (Fed.Cir.1994); *Scripps,* 927 F.2d at 1576. However, this concession does not necessarily mandate a jury or bench trial. Thus, if there are no material or genuine facts in dispute relative to the anticipation question, a defen-

dant may well be able to prevail on a motion for summary judgment. *See Lockwood v. American Airlines, Inc.,* 107 F.3d 1565 (Fed.Cir.1997); *Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494 (Fed. Cir.1992); *compare Tillotson Ltd. v. Walbro Corp.,* 831 F.2d 1033, 1037 (Fed.Cir. 1987). Stated another way, if, after examining the claims in the '115 patent in the present matter, the Court finds that no factual dispute exists and the claims were anticipated, Defendant is entitled to summary judgment.

### 2. The Every Element Test

Two analyses are at play in the interpretation of patent claims and the assessment of anticipation, the "every element" test and the "enablement" standard. *Messerschmidt v. United States,* 29 Fed.Cl. 1, 21 (1993). The first test requires that, for anticipation to occur, each and every element of a patent claim must be disclosed in a single prior art reference. *Id.; Scripps,* 927 F.2d at 1576; *Verdegaal Broth.,* 814 F.2d at 631. To be clear, despite Plaintiff's contrary interpretation, the test is not whether every claim in the later patent was disclosed in the prior art. *Messerschmidt,* 29 Fed.Cl. at 21. Rather, the test requires an analysis of each specific claim and a determination as to whether the *claim itself* was previously disclosed, either expressly or inherently, in a single prior art reference. *Id.* at 21–22. Thus, the instant analysis requires an examination of claim 1 separate from claim 2 and a determination as to whether each and every element in claim 1 was previously disclosed in the Hitachi reference. The same test is then independently applied to claim 2.

Applying the test, the Court notes that claim 1 of the '115 patent describes a piston ring seal assembly containing alternating small and large piston rings. In

---

**9.** One part of the anticipation inquiry turns on whether the prior reference was published. For the purposes of this question, Japanese patent applications are considered publica-

tions. *See Kubota v. Shibuya,* 999 F.2d 517, 519 (Fed.Cir.1993). The parties do not dispute that the Hitachi reference was validly published prior art.

addition, the '115 patent teaches that each of the large rings has a coefficient of thermal expansion greater than that of the turbine casing, thus expanding more under the high operating temperatures. Claim 1 also teaches that the material used for each of the small rings has a coefficient of thermal expansion less than that of the steam inlet pipe therefore expanding less then the inlet pipe under operating conditions.

Similarly, the Hitachi reference teaches a piston ring seal assembly with large rings made from a material with a coefficient of thermal expansion greater than that of the casing surrounding them, and small rings fabricated from a material having a coefficient of thermal expansion less than that of the steam inlet pipe that is surrounded by the small rings. The Court finds that these rings are arranged in an alternating fashion and are described in much the same manner as the '115 patent. Thus, both claim 1 in the '115 patent and the Hitachi reference describe a system whereby the coefficient of thermal expansion of the seal and the material against which it is sealing get tighter under increasing temperatures increasing the overall efficiency of the steam turbine. At bottom, the Court finds no discernable difference between claim 1 and the disclosures in the Hitachi reference.

Claim 2 of the '115 patent specifies that "the small piston rings are fabricated from materials selected from any of the martensitic stainless steels for use at elevated temperatures." (Def. Exhibit B; Pl. Exhibit 6 at 28629). The Hitachi reference teaches that the small rings can be fabricated from 12Cr steel, an example of a martensitic stainless steel. (See Def. Exhibit F at 23–15.) The '115 patent also

names 12Cr steel as a usable example of a martensitic steel. Relying on verbal descriptions, reprints of both the pertinent parts of the '115 patent and the Hitachi reference, as well as schematic drawings provided by both parties, the Court can find no pragmatic difference between the inventions.[10]

While not dispositive, the Court finds it worthy of mention that Brandon, the inventor of the '115 patent, admitted in his deposition that there is a "strong similarity" between the Hitachi reference and claim 1 of the '115 patent. (See Def. Exhibit A at 598–606.) Brandon was also unable to identify any meaningful difference between the teachings in the Hitachi reference and those described in either claims 1 or 2 of the '115 patent. Id. Finally, Brandon stated at his deposition that he was unaware of the Hitachi reference when he was prosecuting the '115 patent and that, had he known of it at the time, he surely would have told the PTO patent examiner about it. (Def. Exhibit A at 604–06.) This last concession, however, seriously undermines the presumption of patent validity. See American Hoist & Derrick, 725 F.2d at 1359–60. ("Indeed, new prior art not before the PTO may so clearly invalidate a patent that the burden [of demonstrating invalidity] is fully sustained merely by proving its existence and applying the proper law.").

### 3. The Enablement Standard

Although, in the Court's opinion, Plaintiff fails the every element test, the anticipation inquiry does not necessarily end there. See Messerschmidt, 29 Fed.Cl. at 21. Plaintiff argues vigorously that there is also an enabling component of the anticipation query, namely, that "the disclosure must be such as will give possession of the invention to the person of ordinary skill."

---

10. Plaintiff, correctly, does not assert that the specification of a particular martensitic steel, as in the Hitachi reference, is any sort of bar to anticipation. Nor does Plaintiff contend that the generalization of martensitic steel for the small piston rings in claim 2 of the '115 patent is somehow inconsistent with the specification of one species in a genus of steel and thus inconsistent with Defendant's claim of anticipation. See Messerschmidt, 29 Fed.Cl. at 21 n. 7.

*Paperless Accounting, Inc. v. Bay Area Rapid Transit Sys.,* 804 F.2d 659, 665 (Fed.Cir.1986) (internal citations and quotation marks omitted). It is settled that a person of ordinary skill means someone in the particular field. *Messerschmidt,* 29 Fed.Cl. at 21.

Plaintiff suggests that the enablement requirement focuses on the validity of the invention as a whole. Arguing that the invention is essentially the entirety of the '115 patent, or at least claims 1 and 2 together, Plaintiff avers that claims 1 and 2 are useless without the subsequent teachings of claim 3. Plaintiff contends further that absent the teaching in claim 3, which is undisputedly lacking in the Hitachi reference, someone skilled in the field would be unable to recreate a similar invention using only the prior art.

Unfortunately for Plaintiff, its argument misconstrues the definition of 'invention' to mean final working product, rather than correctly viewing each of the claims as 'inventions' themselves. *Markman,* 116 S.Ct. at 1387–88. In so doing, Plaintiff also confuses the enablement requirement to mean that the claimed final outcome (in this case, the whole of the piston ring seal assembly) must be successful in order for a prior art reference to be enabling.

It is also the opinion of the Court that Plaintiff proves too much regarding claims 1 and 2. In attempting to show that claim 3 is necessary to make claims 1 and 2, the undisputed facts show that claims 1 and 2 are equal to the prior art disclosures. Indeed, the very fact that Brandon was able to create the inventions in claims 1 and 2 leads to the inescapable conclusion that someone skilled in the art could and did possess the prior art reference. Therefore, the disclosures in the Hitachi reference, which are equal to claims 1 and 2, are enabling. That the entire seal assembly will not work without the material specified in claim 3 is irrelevant to the instant case.

Finally, even if the Court were to use Plaintiff's misconstrued standard for enablement, the standard as applied is not nearly as rigorous as Plaintiff suggests. A prior patent actually meets the enablement requirement even if it fails to teach all the principles of an invention to those possessing ordinary skill in the particular field. *In re Paulsen,* 30 F.3d 1475, 1478 (Fed. Cir.1994); *Scripps,* 927 F.2d at 1572; *See also Ex parte Thomson,* 24 U.S.P.Q.2d 1618, 1620, 1992 WL 336793 (Bd.Pat.App. & Interf.1992) ("The mere fact that some experimentation is necessary ... is not fatal to enablement where as here the procedures ... are routine."). Plaintiff's expert's affidavit to the contrary, the Court remains convinced that the prior art was enabling as a matter of law.[11] That "perhaps some testing" may be necessary by someone skilled in the field, (Shifler Aff. ¶ 22), does not preclude the Court's finding, since some experimentation is acceptable under the enablement standard.

In sum, the facts presented to the Court establish, without genuine or material dispute and by clear and convincing evidence, that the Hitachi reference contains each and every claim limitation set forth in claims 1 and 2 of the '115 patent. Accordingly, Defendant is entitled to partial summary judgment of invalidity under 35 U.S.C. § 102(a) and (b).

**11.** In his affidavit, Plaintiff's steam turbine expert, Richard Shifler, states that, without a material for the large rings, claim 3 of the '115 patent, he could not recreate the invention in claims 1 and 2. To do so, he would need to consider such factors as the coefficient of thermal expansion of the pipe casing material and candidate materials for the large rings under great temperature varia- tions, the range of temperatures to which the assembly would be subjected and the oxidation and corrosion properties of both the casing material and the candidate ring materials. He states further that he would also need to calculate the appropriate ring size of the large rings in claim 3 based on those previously noted considerations. (Shifler Aff. ¶¶ 1–6, 23.)

## V. *CONCLUSION*

For the foregoing reasons, the Court recommends that Defendant's motion for summary judgment with respect to unenforceability be DENIED, but that Defendant's motion for partial summary judgment with respect to invalidity (regarding claims 1 and 2) be ALLOWED.[12]

**12.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.